Mark S. Davis, CHIEF UNITED STATES DISTRICT JUDGE
This matter is before the Court on a Motion to Dismiss filed by Defendants Bentley Motors Limited and Bentley Motors, Inc. (collectively "Defendants" or "Bentley"), pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 33. For the reasons stated below, Defendants' Motion to Dismiss is DENIED.
I. FACTUAL and PROCEDURAL HISTORY[1]
A. The Parties
Jaguar Land Rover Limited ("Plaintiff" or "Jaguar Land Rover" or "JLR") is a British corporation. Am. Compl., ECF No. 31 ¶ 1. Jaguar Land Rover manufactures four-wheel drive Sports Utility Vehicles ("SUVs") including the Jaguar F-Pace, Land Rover Discovery Sport, Land Rover Discovery, Range Rover Evoque, Range Rover Velar, Range Rover Sport, and The Range Rover. Id. ¶ 14. JLR's patented Terrain Response technology is included on these vehicles. Id. ¶ 15.
Defendant Bentley Motors Limited is a British corporation, id. ¶ 3, and Defendant Bentley Motors, Inc. is the U.S.-based sales company for and wholly-owned subsidiary of Bentley Motors Limited, id. ¶ 6. Defendant Bentley Motors, Inc. is incorporated in Delaware with its principal place of business in Virginia. Id. ¶ 4. Bentley designs, develops, manufactures and sells luxury motor vehicles. Id. ¶ 40.
B. The Patent
On May 8, 2018, the United States Patent and Trademark Office issued U.S. Patent No. RE46,828, titled "Vehicle Control." Id. ¶ 8; see also id., Ex. A ("the '828 patent"). Jaguar Land Rover's Terrain Response technology is embodied in the '828 patent. Id. ¶ 21. The '828 patent is a reissue of U.S. Patent No. 7,349,776. Id. ¶ 10; see also id., Ex. B ("the '776 patent"). JLR held all right, title, and interest in the '828 and '776 patents. Id. ¶¶ 9-10.
The '828 patent generally "relates to the control of vehicles, in particular to the coordinated control of a number of subsystems of a vehicle.... Various systems are known in which operation of various subsystems of a vehicle can operate in different configuration modes so as to suit different conditions." '828 patent, col 1:14-20. Like other vehicle control systems, the '828 patent operates as follows: "the control of a number of the vehicle subsystems *670 is coordinated by a central vehicle controller, which can be switched between a number of modes thereby controlling all of the subsystems in a coordinated way which is simple for the driver to control." Id., col 1:41-46. Other systems, however, "do[ ] not provide the driver with the ability to provide direct input regarding the surface terrain in an attempt to better select the appropriate subsystem configuration modes. This deficiency results in the less than optimal stability, handling, and safety performance of the vehicle." Id., col 1:52-57.
Specifically, the Terrain Response technology electronically controls various vehicle subsystems, including the engine, the transmission, the brakes, the traction control, the suspension and the steering, to operate in a manner that is suitable for driving on a particular off-road surface. Id. ¶ 16. The driver of the vehicle uses an input panel to select from several off-road driving surfaces including Grass/Gravel/Snow, Mud and Ruts, Sand, and Rocks. Id. Claim 18 recites:
A vehicle control system having a driver input for selecting a surface terrain, the vehicle control system arranged to control a plurality of vehicle subsystems each of which is operable in a plurality of subsystem configuration modes, wherein the vehicle control system is operable in a plurality of driving modes in each of which it is arranged to select the subsystem configuration modes in a manner suitable for a respective surface terrain.
'828 patent, col 19:65-20:5.
The Terrain Response controller then instructs each of the subsystems to operate in a manner or mode that is suitable for driving on the selected surface. Am. Compl. ¶ 16.
Claims 19 and 20 recite:
A vehicle control system according to claim 18, wherein one of the plurality of vehicle subsystems is a suspension subsystem.
A vehicle control system according to claim 19, wherein the plurality of vehicle subsystems further comprise a steering subsystem, a brake subsystem, an engine management subsystem, and a transmission subsystem.
'828 patent, col 20:6-12. The technology also allows the driver to further adjust the operation of the subsystems. Am. Compl. ¶ 17. The claimed elements in combination is alleged to be implemented in an unconventional and non-trivial manner, and are not generic vehicle components, but a control system that is not standard and cannot be purchased off-the-shelf. Id. ¶ 32.
C. Infringement
In 2016, Bentley launched its first SUV, the Bentayga, which is a direct competitor to JLR's Range Rover model. Id. The Bentayga has a Drive Dynamics system, which can be equipped with an "All Terrain Specification" that provides four off-road settings: "Snow, Ice & Wet Grass," "Dirt & Gravel," "Mud & Trail," and "Sand." Id. On information and belief, the off-road settings in the All Terrain Specification adjust various vehicle subsystems including the electronic stability-control system, traction-control system, engine, gearbox, and suspension settings to improve performance on different off-road driving surfaces. Id. ¶ 41.
The Amended Complaint alleges on information and belief, that Bentley knowingly copied the Terrain Response system installed on JLR's Range Rover. Id. ¶ 41. Bentley became aware of the '776 patent by at least February 5, 2016. Id. ¶ 11. On February 5, 2016, JLR sent a letter to Bentley stating that the Bentley Bentayga has a "Driver Assistance" system that infringed *671 upon the '776 patent. Id. On or about February 5, 2018, representatives from JLR met with representatives from Bentley, and informed Bentley that JLR had received a Notice of Allowance for the '828 patent and expected it to be granted shortly. Id. ¶ 12. On May 24, 2018, JLR sent a letter to Bentley indicating that the '828 patent had issued on May 8, 2018, and reiterating that the Bentley Bentayga infringes upon JLR's patents. Id. ¶ 13.
Specifically, JLR asserts that Bentley has infringed upon at least claims 21, 41, and 46 of the '828 patent. Id. ¶ 50. Claim 21 recites:
A vehicle control system having a driver input device for selecting a driving surface, the vehicle control system arranged to control a plurality of vehicle subsystems each of which is operable in a plurality of subsystem configuration modes, wherein the vehicle control system is operable in a plurality of driving modes in each of which it is arranged to select the subsystem configuration modes in a manner suitable for a respective driving surface, and further wherein the plurality of driving modes includes at least two offroad modes in which the subsystem configurations are controlled in a manner suitable for driving on respective off-road driving surfaces, and an on-road mode in which the subsystem configurations are controlled in a manner suitable for driving on-road and still further wherein one of the off-road modes is a sand mode in which the vehicle subsystems are controlled in a manner suitable for driving on sand.
'828 patent, col 20:13-28. That is, claim 21 and its dependents are directed to a vehicle control system that optimizes control of the vehicle on a sand surface. Am. Compl. ¶ 29. When a vehicle is driven on sand, "the build up of matter in front of the wheels under braking can improve braking performance." '828 patent at col 4:54-56. Low wheel spin at low speeds "prevent[s] the wheel from digging into the sand" but high wheel spin at high speeds "[is] less of a problem and can even improve traction." '828 patent at col 8:37-40. Claim 21 and its dependents recite limitations that would capture these benefits through specific implementations; for instance, by "allow[ing] lower levels of wheel spin when the vehicle is travelling at lower speeds than when the vehicle is travelling at higher speeds" because "responsiveness to movement of the throttle pedal is lower at relatively low vehicle speeds than it is at higher vehicle speeds," '828 patent at col 20:35-37 (claim 22), col 20:39-42 (claim 23), or through a brake subsystem which "is arranged to allow a relatively high degree of wheel slip under braking relative to the on-road mode and/or a second off-road mode," '828 patent at col 20:45-48 (claim 24). Am. Compl. ¶ 29.
Claim 41 recites:
A vehicle control system having a driver input device for selecting a driving surface, the vehicle control system arranged to control a plurality of vehicle subsystems each of which is operable in a plurality of subsystem configuration modes, wherein the vehicle control system is operable in a plurality of driving modes in each of which it is arranged to select the subsystem configuration modes in a manner suitable for a respective driving surface, and further wherein the plurality of driving modes includes at least two offroad modes in which the subsystem configurations are controlled in a manner suitable for driving on respective off-road driving surfaces, and an on-road mode in which the subsystem configurations are controlled in a manner suitable for driving on-road and still further wherein one of the subsystems is *672 a suspension subsystem and, in a second off-road mode, the suspension system is arranged to provide a higher ride height than in a first off-road mode.
'828 patent, col 22:52-23:2. That is, claim 41 and its dependent (claim 42) are directed to a vehicle control system that optimizes control through adjustment of the suspension system based on the particular driving surface. Am. Compl. ¶ 30. When traveling at high speeds on flat surfaces with good levels of friction, a suspension ride height that "is set at 'low' for low wind resistance and good stability" is optimal. '828 patent at col 10:7-11. Claim 41 and its dependent recite limitations that would capture these benefits through specific implementations, such as requiring an off-road mode where "the suspension system is arranged to provide a higher ride height than in the on-road mode," '828 patent at col 23:4-6 (claim 42).
Claim 46 recites:
A vehicle control system having a driver input device for selecting a driving surface, the vehicle control system arranged to control a plurality of vehicle subsystems each of which is operable in a plurality of subsystem configuration modes, wherein the vehicle control system is operable in a plurality of driving modes in each of which it is arranged to select the subsystem configuration modes in a manner suitable for a respective driving surface, and further wherein the plurality of driving modes includes at least two offroad modes in which the subsystem configurations are controlled in a manner suitable for driving on respective off-road driving surfaces, and an on-road mode in which the subsystem configurations are controlled in a manner suitable for driving on-road, and still further wherein one of the subsystems is a speed control system arranged to control the speed of the vehicle when descending a hill, and wherein the speed control system is arranged to be switched on in at least one of the off-road modes and switched off in the on-road mode.
'828 patent, col 23:66-24:17. That is, claim 46 is directed to a vehicle control system that optimizes control through adjustment of the speed control system. Am. Compl. ¶ 31. To provide maximum control on hills, a vehicle has "the standard default target speed of 6 kph." '828 patent at 14:53-55. Claim 46 recites limitations that would capture this benefit through a specific implementation that requires a speed control system "arranged to control the speed of the vehicle when descending a hill" and "arranged to be switched on in at least one of the off-road modes and switched off in the on-road mode." Am. Compl. ¶ 31 (quoting claim 46).
D. Procedural History
On June 14, 2018, Jaguar Land Rover filed its original complaint in this Court. ECF No. 1. On October 19, 2018, Bentley filed a motion to dismiss. ECF No. 29. On November 1, 2018, JLR filed the Amended Complaint. ECF No. 31.
The Amended Complaint contains a single count, alleging that Bentley infringed upon the '828 Patent. Am. Compl., ECF No. 33 ¶¶ 49-122. Defendants filed a renewed motion to dismiss. ECF No. 33. The motion and accompanying memorandum of law argues that '828 patent claims patent-ineligible subject matter. Plaintiff then filed a response, Pi. Resp., ECF No. 38, and Defendants filed a reply, Def. Reply, ECF No. 39. The matter is now ripe for decision.
II. STANDARD OF REVIEW
The well-established Rule 12(b)(6) standard of review permits dismissal when a complaint fails "to state a *673 claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although a complaint need not be detailed, the " [f] actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555, 127 S.Ct. 1955 ; see Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court " 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.' " Kensington Volunteer Fire Dep't v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012) (citation omitted).[2] Although the truth of the facts alleged is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000) ; see Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ). "Threadbare recitals of the elements of a cause of action, supported by mere Conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.' " Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 ).
A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to " ... give the defendant fair notice of what the ... claim is and the grounds upon which it rests...." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)...." Id. at 555, 127 S.Ct. 1955 (internal citations omitted).
III. DISCUSSION
Defendants argue that Plaintiff's patent infringement claim should be dismissed because Plaintiff's patents are invalid for failure to claim patent-eligible subject matter under 35 U.S.C. § 101.
The Intellectual Property Clause of the United States Constitution empowers Congress "[t]o promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const., art. I, § 8. Pursuant to such authority, Congress has defined the subject matter eligible for patent protection by providing that "[w]hoever invents or discovers *674 any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. However, as the Supreme Court reiterated in Alice Corp. Pty. Ltd. v. CLS Bank International, "this provision contains an implicit exception: [1]aws of nature, natural phenomena, and abstract ideas are not patentable.' " 573 U.S. 208, 216, 134 S.Ct. 2347, 189 L.Ed.2d 296 (quoting Ass'n for Molecular Pathology v. Myriad Genetics, 569 U.S. 576, 589, 133 S.Ct. 2107, 186 L.Ed.2d 124 (2013) ). In explaining such an implicit exception, the Supreme Court noted:
[w]e have described the concern that drives this exclusionary principle as one of pre-emption. Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work. Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws. We have repeatedly emphasized this ... concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity.
At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas....
Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas, and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws.
Alice, 573 U.S. at 216-17, 134 S.Ct. 2347 (internal citations and quotation marks omitted). Accordingly, with those preemption principles in mind, an invention claims patent-eligible subject matter if it is directed to a "process, machine, manufacture, or composition of matter" and does not constitute an attempt to patent a law of nature, natural phenomenon, or abstract idea.
Congress has established that the burden of demonstrating that a patent claims ineligible subject matter lies with the party challenging validity. Under 35 U.S.C. § 282,
[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.
35 U.S.C. § 282. The statutory presumption of validity that attaches to a patent is recognized by the Federal Circuit to extend to the determination of abstractness under § 101. CertusView Techs., LLC v. S & N Locating Servs., LLC, 287 F. Supp. 3d 580, 586 (E.D. Va. 2018) (citing CLS Bank Int'l. v. Alice Corp. Pty. Ltd., 717 F.3d 1269, 1304 (Fed. Cir. 2013) ).
In addition, " '[a] party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and *675 convincing evidence.' " Nystrom v. TREX Co., 424 F.3d 1136, 1149 (Fed. Cir. 2005) (quoting State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1067 (Fed. Cir. 2003) ). The Fourth Circuit has established the following "clear and convincing evidence" standard:
"[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable."
United States v. Hall, 664 F.3d 456, 461-62 (4th Cir. 2012) (alteration in original) (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001) ).
To determine whether the patents-in-suit claim patent-ineligible subject matter, the Court must apply the two-step framework that the Supreme Court set forth in Alice. First, the Court must "determine whether the claims at issue are directed to one of [the] patent-ineligible concepts," that is, laws of nature, natural phenomena, and abstract ideas. Alice, 573 U.S. at 217, 134 S.Ct. 2347 (citing Mayo Collaborative Servs. v. Prometheus Labs., Inc., 566 U.S. 66, 75, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012) ). To determine whether a claim is directed to a patent-ineligible abstract idea, a court must evaluate the claims "[o]n their face" to determine to which "concept" the claims are "drawn." Alice, 573 U.S. at 219, 134 S.Ct. 2347 ; see also Bilski v. Kappos, 561 U.S. 593, 609, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). In other words, a court "must identify the purpose of the claim ... what the claimed invention is trying to achieve ... and ask whether the purpose is abstract." Cal. Inst. of Tech. v. Hughes Commc'ns Inc., 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014).
Importantly, though the Supreme Court has not "delimit[ed] the precise contours of the 'abstract ideas' category" of patent ineligible subject matter, Alice, 573 U.S. at 221, 134 S.Ct. 2347, the Court has indicated that such category is not limited simply to "preexisting, fundamental truth[s] that exist in principle apart from any human action," id. at 220, 134 S.Ct. 2347 (alteration in original) (citation and internal quotation marks omitted). The Supreme Court has suggested that a "method of organizing human activity" or "fundamental economic practice" can fall within the patent-ineligible category of abstract ideas. See id. However, as noted above, the Supreme Court has warned courts to "tread carefully" when wielding this invalidity tool, since "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Id. at 217, 134 S.Ct. 2347.
Second, if an invention is directed toward a patent-ineligible abstract idea, the Court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." Alice, 573 U.S. at 217, 134 S.Ct. 2347 (quoting Mayo, 566 U.S. at 78, 132 S.Ct. 1289 ). Those additional elements "must be more than 'well-understood, routine, conventional activity.' " Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715 (Fed. Cir. 2014) (quoting Mayo, 566 U.S. at 79, 132 S.Ct. 1289 ). Whether the additional elements are well-understood, routine, or conventional activity should be assessed at the time the patent application is filed. In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig., 774 F.3d 755, 764 (Fed. Cir. 2014) ; Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014). "Whether the claim elements or *676 the claimed combination are well-understood, routine, [or] conventional is a question of fact." Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1128 (Fed. Cir. 2018) ; see also Berkheimer v. HP Inc., 881 F.3d 1360, 1368 (Fed. Cir. 2018).
This second step is "a search for an 'inventive concept' - i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " Alice, 573 U.S. at 218-19, 134 S.Ct. 2347 (quoting Mayo, 566 U.S. at 72-73, 132 S.Ct. 1289 ). Yet, "transformation into a patent-eligible application requires 'more than simply Stat[ing] the [abstract idea] while adding the words 'apply it.' " Alice, 573 U.S. at 221, 134 S.Ct. 2347 (quoting Mayo, 566 U.S. at 72, 132 S.Ct. 1289 ). Moreover, "the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity,' " Bilski, 561 U.S. at 610-11, 130 S.Ct. 3218 (quoting Diamond v. Diehr, 450 U.S. 175, 191-92, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) ), and the narrowness of an abstract idea does not render patentable an otherwise patent-ineligible idea, see buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1353 (Fed. Cir. 2014) (citing Mayo, 566 U.S. at 88, 132 S.Ct. 1289 ). Nor does "the mere recitation of a generic computer ... transform a patent-ineligible abstract idea into a patent-eligible invention." Alice, 573 U.S. at 223, 134 S.Ct. 2347.
A. Abstract Idea
First, the Court addresses Alice Step 1 - whether the claims are directed to an abstract idea. The Court must examine the claims of the patent in their entirety to understand what their "character as a whole" is "directed to." Electric Power Group, LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016) (" [W]e have described the first-stage inquiry as looking at the 'focus' of the claims, their 'character as a whole[.]' ") (citation omitted); Accenture Glob. Servs., GmbH v. Guidewire Software, Inc., 728 F. 3d 1336, 1341 (Fed. Cir. 2013) ("[T]he court must first identify and define whatever fundamental concept appears wrapped up in the claim.") (internal quotation marks and citation omitted)). In distilling the character of a claim, the Court is careful not to express the claim's focus at an unduly "high level of abstraction ... untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1337 (Fed. Cir. 2016) ; see also Thales Visionix Inc. v. United States, 850 F.3d 1343, 1347 (Fed. Cir. 2017) ("We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.").[3]
Here, the Court finds that the claims of the '828 patent are "directed to" manipulating multiple vehicle subsystems to allow a vehicle to better adapt to driving on various types of on-road and off-road surfaces. Having determined the "character *677 as a whole" of the claims, the Court turns to the question of whether it is directed to an abstract idea. Enfish, 822 F.3d at 1335 (citation omitted). When engaging in "abstract idea" analysis, courts will generally compare the claims at issue to prior § 101 cases, as well as refer to several basic principles, including: 1) whether the claims are directed to an improvement to computer (or any other technological) functionality, and 2) whether the claims are directed to a mental process or a process that can be performed with a pen and paper. Procter & Gamble Co. v. QuantifiCare Inc., 288 F. Supp. 3d 1002, 1017 (N.D. Cal. 2017).
1. Functionality
The parties largely dispute which of these two principles is more pertinent. Plaintiff argues that the claims are directed to an improvement in computer functionality because the technology permits the manipulation of multiple vehicle subsystems at once. Defendants dispute this characterization.
The Federal Circuit has distinguished between claims directed towards merely performing a "function" and claims directed to "a particular way of performing that function." Affinity Labs of Texas, LLC v. Amazon.com Inc., 838 F.3d 1253, 1258 (Fed. Cir. 2016) (finding that claims directed to "providing out-of-region access to regional broadcast content" were directed to an abstract idea because "providing out-of-region access to regional broadcast content" was a "broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it" and "entirely functional in nature."). The former generally falls into the abstract-idea category, while the latter generally does not. Id. Claims that improve the functioning of a computer provide a particular means to perform a function, and therefore, fall in the latter category and are not directed towards an abstract idea. Enfish, 822 F.3d at 1335 (finding claims were "directed to an improvement to computer functionality [instead of] being directed to an abstract idea."); see also Alice, 573 U.S. at 225, 134 S.Ct. 2347 (stating that a claim is not abstract if it "improve [s] the functioning of the computer itself" or "effect[s] an improvement in any other technology or technical field.").
When considering claims purportedly directed to "an improvement of computer functionality," the Court must "ask[ ] whether the focus of the claims is on the specific asserted improvement in computer capabilities ...or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." Enfish, 822 F.3d at 1335-36 ; see also McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1315 (Fed. Cir. 2016) (finding the claimed process was not an abstract idea as it "uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results."). Although inventiveness is the critical question at step 2 of the Alice framework, because improvements to technology are not directed towards an abstract idea, it is "relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea, even at the first step of the Alice analysis." Enfish, 822 F.3d at 1335.
Plaintiff alleges that the Terrain Response technology is a technological improvement to vehicle control systems. Am. Compl. ¶ 22. Prior to the '828 patent, drivers had to know the appropriate configurations of various subsystems when driving off-road on particular driving surfaces, the subsystems had to be manually changed one at a time, and a limited *678 number of subsystems could be manipulated at one time. Id. ¶ 23. The '828 patent improves vehicle control technology by permitting a driver to control multiple subsystems at once and provides preset configurations of various subsystems for particular surfaces. Id. ¶¶ 23, 27. Plaintiff analogizes this technology to a technology that generated food menus with certain features. Apple, Inc. v. Ameranth, Inc., 842 F.3d 1229, 1235, 1241 (Fed. Cir. 2016) ("The patents describe a preferred embodiment of the invention for use in the restaurant industry. In that embodiment, a menu consists of categories such as appetizers and entrees, items such as chicken Caesar salad, modifiers such as dressing, and sub-modifiers such as Italian and blue cheese.... The menu may be displayed to a user and then another menu may be generated "in response to and comprised of the selections made.").
As further discussed below, the technology does appear directed to improvements in functionality.
2. Mental Process
On the other hand, Defendants characterize the claims as mere computerization of what drivers already do in their mind - for instance, by slowing down while going downhill. Courts have found that merely using computers to perform what people can otherwise do is patent-ineligible. Bilski, 561 U.S. at 609, 130 S.Ct. 3218 (finding that a program that applies economic principles to hedge risk in energy markets was patent-ineligible); buySAFE, 765 F.3d at 1355 (finding a program that guarantees a party's performance of its online transaction was patent ineligible as forming contractual relationships was "of ancient lineage"); Voter Verified, Inc. v. Election Sys. & Software LLC, 887 F.3d 1376, 1385 (Fed. Cir. 2018), cert, denied, --- U.S. ----, 139 S.Ct. 813, 202 L.Ed.2d 577 (2019) (finding program patent-ineligible as "the claims as a whole are drawn to the concept of voting, verifying the vote, and submitting the vote for tabulation. Humans have performed this fundamental activity that forms the basis of our democracy for hundreds of years.").
As further discussed below, the Court finds that the technology is not mere computerization of a mental process.
3. Abstract Idea Conclusion
Applying these principles and construing the pleadings in the light most favorable to Plaintiff, the Court finds that the claims are not directed to an abstract concept. As discussed above, Plaintiff compares the technology to a program that improves the display of food menus and Defendants compare this technology to programs that collect information or apply economic formulas, i.e. what people already do. However, the Court finds that the most analogous technology to that embodied by the '828 patent is cruise control technology which commonly exists in vehicles. Courts have found that such systems, which allow a driver to set and maintain a steady speed, are patentable and not directed at an abstract idea. For example, in a recent opinion from the District of Delaware, the court reached the following conclusion:
The claims are directed to a physical system operating in three-dimensional space that, when certain conditions are met, physically impacts the speed of a moving object. Far from an abstract idea, the claims are directed to a tangible system, or a method of using such a system, with an observable real-world impact. Moreover, the claims are meaningfully limited to implementation of the method with an adaptive cruise control system having lateral acceleration sensors.
See, e.g., *679 Carrum Techs., LLC v. BMW of N. Am., LLC, No. 1:18-CV-01645-RGA, 2019 WL 1779863, at *3 (D. Del. Apr. 23, 2019). As discussed supra at 677-78, Plaintiff has alleged that the technology embodied in the '828 patent claims improves computer functionality by allowing a driver to select one configuration on an input panel and then control multiple subsystems, which is an improvement to existing vehicle control technology. However, more fundamentally than that, the technology physically changes the subsystems of the vehicle. For instance, claim 21 and its dependents "allow lower levels of wheel spin when the vehicle is travelling at lower speeds than when the vehicle is travelling at higher speeds," '828 patent at col 20:39-42 (claim 23), and "allow a relatively high degree of wheel slip under braking," '828 patent at col 20:45-48 (claim 24). Claim 41 adjusts the suspension subsystem, and changes the actual height of the vehicle. '828 patent, col 22:52-23:2. Claim 46 controls the speed of the vehicle in certain conditions, for instance, when the vehicle is going downhill, which is nearly identical to the claims made by cruise control systems. '828 patent, col 23:66-24:17. These claims do more than just perform a function, which Defendants characterize as driving differently in different conditions, but rather provide "a particular way of performing that function." Affinity Labs, 838 F.3d at 1258. Therefore, like cruise control technology which physically changes a vehicle to provide a means of performing a particular function, the technology embodied in the '828 patent also changes a vehicle to provide a means of performing a particular function and is therefore not directed towards an abstract idea.
For this reason, the Court also finds the Defendants' citations to Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC, 635 F. App'x 914 (Fed. Cir. 2015) inapposite. The patent in Vehicle Intelligence claimed technology that screened equipment operators for impairment, for instance, intoxication, physical impairments like injuries, and medical impairments like heart attacks, and controlled the equipment if an impairment was detected. 635 F. App'x at 916. As the Federal Circuit noted in Vehicle Intelligence:
critically absent from the entire patent is how the existing vehicle equipment can be used to measure these characteristics; assuming these measurements can be made, how the decision module determines if an operator is impaired based on these measurements; assuming this determination can be made, how the decision module decides which control response to make; and assuming the control response decision can be made, how the "expert system" effectuates the chosen control response. At best, the '392 patent answers the question of how to provide faster, more accurate and reliable impairment testing by simply stating "use an expert system." Thus, in the absence of any details about how the "expert system" works, the claims at issue are drawn to a patent-ineligible abstract idea, satisfying Mayo / Alice step one.
Id. at 918. That is, the patent in Vehicle Intelligence broadly claimed an "expert system," but failed to provide any specificity on the particular way of performing a function, and therefore was directed towards an abstract idea. In that patent, "[n]one of the claims at issue are limited to a particular kind of impairment, explain how to perform either screening or testing for any impairment, specify how to program the 'expert system' to perform any screening or testing, or explain the nature of control to be exercised on the vehicle in response to the test results." Id. at 917. In contrast, the claims of the '828 patent in this case are directed at particular driving *680 conditions and specify which vehicle subsystems address such conditions and how such subsystems change to meet the demands of the changing driving conditions. In other words, the claims explain how the technology performs the ultimate function of adapting to drive on different surfaces.
Further, the court in Carrum Techs. rejected the identical argument raised by Defendants here, namely that cruise control "patents claim mental processes because they claim methods and systems that do exactly what human drivers perform in their minds, without more." Carrum Techs., 2019 WL 1779863, at *3. In rejecting this argument, the court explained that "[a] method of using a physical system is not a 'mental process.' The mere fact that humans have an alternative method of achieving the goals of the claims using sensory perception, mental processing, and physical braking does not foreclose the claims' patent eligibility." Id.
Similarly, in this case, drivers may engage in various mental processes while driving, for instance, driving slower while going downhill, avoiding sharp accelerations or braking while driving on certain surfaces. The technology embodied in the '828 patent, however, physically changes the vehicle's subsystems - wheel spin changes while driving on certain surfaces (claim 21), the suspension changes the height of the vehicle (claim 41), and speed controls are engaged while going downhill (claim 46). It does not computerize what humans would otherwise do by replacing the mental process entirely. Drivers may continue to engage in the same mental processes, but the vehicle itself has adapted to optimize and make driving on different surfaces more efficient.
Finally, the Court notes that it is not clear that people could do what the '828 patent claims to do. Although Defendants provide the example of driving slower downhill or applying the brakes in a different manner, drivers are generally not able to change the wheel spin of their vehicles or change the suspension while the vehicle is moving. Therefore, unlike tabulating a vote or performing basic economic principles, the technology here is more than mere computerization of functions that people can already do.
Because the claims of the patent are directed at both improvements in computer functionality and providing concrete, physical means of implementing the functionality, the Court concludes that the '828 patent is not directed at an abstract idea.
B. Inventive Concept
Although the claims of the '828 patent are not directed at a patent-ineligible abstract idea, the Court will, in the alternative, assume they are directed at an abstract idea and consider briefly Alice Step 2 - whether the claims have been transformed in an inventive way that transforms and applies the idea into a patent-eligible one - as it provides an independent basis for denying the motion to dismiss.
Defendants cite various cases which have held that merely changing the display of information or adding generic computer parts is not inventive. See, e.g., Intellectual Ventures I LLC v. Capital One Fin. Corp., 850 F.3d 1332, 1341 (Fed. Cir. 2017) (affirming the granting of summary judgment where there was no "inventive concept" that transforms the abstract idea of collecting, displaying, and manipulating XML data into a patent-eligible application of that abstract idea. "Rather, the claims recite both a generic computer element - a processor - and a series of generic computer 'components' that merely restate their individual functions - i.e., organizing, mapping, identifying, defining, detecting, and modifying."). However, the Federal Circuit has identified improvements to the *681 efficiency of existing technology as one instance where an abstract idea is transformed in a sufficiently inventive manner to become patent-eligible. Berkheimer, 881 F.3d at 1369 (denying summary judgment in part because material issues of fact existed as to whether some of the claims stored files in an efficient manner, and technology that "eliminates redundancies [and] improves system efficiency" is sufficiently inventive to transform an abstract idea into a patent-eligible concept).
In this case, Defendants have failed to show by clear and convincing evidence that the claims are invalid because the only evidence currently before the Court on inventiveness suggests that the technology embodied in the '828 patent improves efficiency and therefore, is inventive like the technology in Berkheimer. Plaintiff attaches a number of articles and reviews by third parties praising the Terrain Response technology. Specifically, the articles note the inventive features. For instance, one article described the Terrain Response technology as making "getting off the beaten track, and back again, as simple as it has ever been. Twist a knob, flick a lever and away you go. A simplistic explanation, to be certain, but fairly close to the mark for a system which has taken the guesswork out of the best way to handle a wide range of difficult terrain." Am. Compl., Ex. D, ECF 31-4, Kevin Hepworth, First Drive, The Daily Telegraph (October 9, 2004). Another article stated the following in describing the Terrain Response technology: "Electronics have allowed engineers to do many things - among them tune a vehicle for improved off-road performance. Perhaps the pinnacle of this evolution, to date, is Land Rovers' Terrain Response System." Am. Compl., Ex. F, ECF No. 31-6, Richard Russell, Seize Control of All Terrains, The Globe and Mail (May 19, 2005) ("The slick part is the programming that went into this. Terrain response sets operating parameters for ... suspension (firmness and ride height) ... [which] presets these parameters depending on conditions.... [The system can] automatically raise [ ] the suspension to increase ground clearance ... to provide wider range of control in anticipation of difficult conditions.").[4] The Terrain Response technology is also alleged to have received awards for innovation. Am. Compl, ¶ 19, Ex. E, ECF No. 31-5, Land Rover Wins Two Queen's Awards, The Manufacturer (June 27, 2008), available at https://www.themanufacturer.com/articles/land-rover-wins-twoqueens-awards/.[5]
*682 These descriptions all suggest that the Terrain Response technology improves existing vehicle control technology by permitting drivers to control multiple vehicle subsystems when driving in particular conditions or on certain surfaces with a "twist" and a "flick." Therefore, the technology is more efficient and inventive, transforming the idea into a patent-eligible concept. Accordingly, the Court finds that even if the claims were directed at an abstract idea, Plaintiff has alleged sufficient facts to transform such an abstract idea by demonstrating the inventiveness of the technology at this stage. Ultimately, whether such claims are inventive is a question of fact. For these reasons, the Court finds that Plaintiff has satisfied Alice step 2, which is an alternative basis to deny the motion to dismiss the complaint.
IV. CONCLUSION
For the reasons stated above, Defendants' Motion to Dismiss is DENIED. ECF No. 33.
The Clerk is REQUESTED to send a copy of this Opinion and Order to all counsel of record.
IT IS SO ORDERED.

A motion to dismiss under Rule 12(b)(6) is generally limited to a review of the allegations in the complaint itself. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016). However, courts may consider documents that are attached to the complaint as exhibits. Fed. R. Civ. P. 10(c). Thus, the facts recited here are drawn from the Complaint and attached exhibits. They are assumed true only to decide the motion to dismiss. The facts stated here are not factual findings for any purpose other than consideration of the pending motion. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

For procedural questions not unique to patent law including the standard for a motion to dismiss, the Federal Circuit applies the law of the regional circuit, which in this case is the Fourth Circuit. See, e.g., Cleveland Clinic Found. v. True Health Diagnostics LLC, 859 F.3d 1352, 1359 (Fed. Cir. 2017), cert. denied, --- U.S. ----, 138 S. Ct. 2621, 201 L. Ed. 2d 1026 (2018).

The Court notes that although typically each claim of a patent is analyzed separately, courts are not required to evaluate each claim separately if it were clear that they do not "differ in any manner that is material to the patent-eligibility inquiry." Mortg. Grader, Inc, v. First Choice Loan Servs., Inc., 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016). Here, the claims asserted (claims 21, 41, 46) recite different components of the overall technology. For instance, claim 41 controls the suspension subsystem and claim 46 controls the vehicle's speed. Therefore, the Court will analyze the claims jointly.

See also Am. Compl. Ex. I, ECF No. 31-9, David Booth, 2007 Range Rover A Masterpiece in the SUV Gallery, The Star Phoenix (February 2, 2007) (describing how the "system increases both its off-road worthiness and also the ease of use.... Terrain Response automatically optimizes the Range Rover's sub systems - air suspension, Hill Descent Control, etc. - according to five settings [including] ... sand. Simply choose the setting that most suits the terrain and the Range Rover takes care of the rest. Indeed, even after years of testing Range Rovers, I still marvel at how incredibly proficient the ginormous sport-brute is off the beaten path."); Am. Compl., Ex. J, ECF No. 31-10, A New Age of Discovery, Gold Coast Bulletin (Australia) (November 17, 2004) ("The Discovery 3 bristles with new technologies.... Terrain response [ ] automatically selects the most appropriate settings for the vehicle's advanced electronic controls and traction aids."); Am. Compl., Ex. K, ECF No. 31-11, John LeBlanc, Nothing In Its Way: The Land Rover LR3 Can Go Anywhere You Want Thanks to the New Terrain Response System, The Gazette (Montreal) (November 3, 2004); Am. Compl., Ex. L, ECF No. 31-12, All-New Discovery 3 SUV Moves Land Rover Forward, The Record (July 3, 2005) (describing the technology as "a major advance that optimizes driveability and comfort, as well as maximizing traction.").

For the purposes of Alice Step 2 analysis, the Court has not considered documents and press releases, which Jaguar Land Rover itself appears to have published; such self-serving statements can contribute little beyond the allegations in the Amended Complaint in helping the Court determine whether the technology is inventive. See, e.g., Am. Compl., Ex. C, ECF No 31-3, Technology Guide: Terrain Response, Land Rover (July 27, 2015), available at https://www.landrover.co.uk/explore-land-rover/one-life/technology/technology-guide-terrainresponse.html (describing how the Terrain Response technology controls multiple subsystems to operate differently depending on the selected surface); Ex. H, ECF No. 31-8, Land Rover LR3 Wins Prestigious 2005 Motor Trend SUV of the Year, PRNewswire (October 27, 2004) (describing the Terrain Response technology as "set[ting] new standards in off-road performance"); Ex. M, ECF No. 31-12, A Promise of Performance: Land Rover Concept Vehicle Makes First Chicago Appearance, PR Newswire (February 4, 2004) (describing the technology as a "major innovation" that "delivers the best possible on-and offroad composure and control by optimizing the entire vehicle set-up, including suspension, powertrain, throttle response and traction control.").